**Johnny Paul PENRY,
Petitioner-Appellant,**

v.

**James A. LYNAUGH, Director, Texas Department of Corrections, Respondent-Appellee.**

**No. 87-2466.**

United States Court of Appeals, Fifth Circuit.

Nov. 25, 1987.

Rehearing and Rehearing En Banc Denied Dec. 23, 1987.

---

Curtis C. Mason, Staff Counsel for Inmates, Tex. Dept. of Corr., Huntsville, Tex., for petitioner-appellant.

Paula C. Offenhauser, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before REAVLEY and GARWOOD, Circuit Judges.[*]

REAVLEY, Circuit Judge:

This is a collateral attack upon the death sentence by a Texas court of Johnny Paul Penry. With one exception all of the contentions advanced on Penry's behalf are easily rejected. The exceptional contention is that Texas law did not permit the jury to consider, and to apply, all of Penry's personal mitigating circumstances prior to reaching the verdict that mandated his death sentence. We are bound by superior

---

[*] Due to his death on October 19, 1987, Judge Robert M. Hill did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

authority to reject that contention, but we discuss the problem fully to demonstrate why it may merit further consideration.

## I.

On the morning of October 25, 1979, Pamela Carpenter was brutally beaten, raped, and stabbed with a pair of scissors in her own home in Livingston, Polk County, Texas. She died a few hours later, but she was able to relay a description of her assailant to the first police officer on the scene and to the doctor in the hospital.

The description led two local sheriff's deputies to suspect Penry. They went to the house of Penry's father, where Penry was staying. Penry denied any involvement but voluntarily agreed to go with the officers to the police station.

At the police station the officers and Penry were met by a number of other local law enforcement agents. They read Penry his *Miranda* rights and questioned him about a wound on his back. After being warned again, Penry signed a consent to search form. Everybody then went back to the Penry home to retrieve a shirt he had worn earlier that day.

Penry then accompanied the police officers to the scene of the crime. There Penry, for the first time, stated that he had "done it." He was immediately arrested, handcuffed, and read his rights again. He was brought back to the police station and taken before a magistrate. Penry was formally charged with capital murder. The magistrate read and questioned Penry about whether he understood his rights. Penry stated that he understood his rights and signed the warning forms.

Police Chief Bill Smith then questioned Penry after again warning him. Penry agreed to give a statement. Smith took the statement in notes and turned it over to his secretary to type. After the statement was typed, because Penry could not read, it was read to him in front of two non-police witnesses. That statement described the crime in detail, and Penry signed it.

Texas Ranger Cook took a second statement the following day. Again, the statement was read back to Penry in front of two non-police witnesses, and it contained the *Miranda* warnings and a statement that the rights were being waived. The second statement told of the crime in even more detail and contained confessions of Penry's previous crimes.

These two statements formed the heart of the prosecution against Penry. The statements were consistent with the other evidence, including proof that Penry had been at Ms. Carpenter's house once before, Ms. Carpenter's statement about being raped and stabbed, the bloody scissors found at the scene, and the position of the victim's clothing as described by the ambulance attendant. However, there was no physical evidence (blood, semen, fingerprints or hair samples) linking Penry to the scene of the crime.

At a competency hearing before trial, Penry was shown to have limited mental ability. He could not read or write, having never finished the first grade. His IQ indicated mild to moderate retardation. He had been in and out of a number of state schools. His relatives testified that he was beaten as a child and had behaved strangely as both a child and a teenager. Nevertheless, a jury found him competent to stand trial.

At the guilt/innocence phase of his trial, evidence of Penry's limited mental capacity was reintroduced. There was disagreement among the three testifying psychiatrists whether Penry was insane: the defense psychiatrist opined that he was, but the state's two psychiatrists disagreed. There was also disagreement over the degree of Penry's mental limitation and the cause of the limitations. However, all of the psychiatrists agreed that Penry had mental limitations, whether caused by a birth trauma or by childhood environmental factors such as beatings and being locked in his room for extended periods of time. They also agreed that Penry's problems manifested themselves, among other ways, in an inability to learn from his mistakes.

The jury rejected Penry's insanity defense and found him guilty of capital murder. Tex.Penal Code Ann. § 19.03 (Vernon

1974). The jury then answered "yes" to all three "special issues," and Penry was sentenced to death. Tex.Crim.Proc.Code Ann. art. 37.071 (Vernon 1981 & Supp.1987). The Texas Court of Criminal Appeals affirmed the conviction and sentence. *Penry v. State,* 691 S.W.2d 636 (Tex.Crim.App. 1985), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986).

## II.

Penry argues that it would be cruel and unusual punishment to execute a mentally retarded person such as himself. He cites *Ford v. Wainwright,* 477 U.S. 399, ——, 106 S.Ct. 2595, 2600, 91 L.Ed.2d 335 (1986), for the proposition that "idiots and lunatics are not chargeable for their own acts." An identical claim has recently been rejected by this court. *Brogdon v. Butler,* 824 F.2d 338, 341 (5th Cir.1987). Penry's claim is without merit.

Penry raises a number of issues regarding his two confessions. He first claims that they should have been suppressed because they were the fruit of an illegal arrest. A Fourth Amendment claim of illegal arrest is foreclosed in habeas if the state "provided an opportunity for full and fair litigation" of the claim. *Stone v. Powell,* 428 U.S. 465, 493–95, 96 S.Ct. 3037, 3052–53, 49 L.Ed.2d 1067 (1976). Recognizing the *Stone* bar, Penry argues that he did not have a "full and fair" suppression hearing. He claims that the state limited his investigator's fees, that a police officer who testified at both the suppression hearing and trial lied at the suppression hearing, and that the state failed to provide him with one of his previous confessions. Penry's claims are without merit. Penry does not point out what difference more investigator's fees, or having his previous confession, would have made. The police officer's testimony at the suppression hearing was not inconsistent with his trial testimony. We have made an "independent evaluation of the state court record" and are satisfied that Penry's "opportunity to contest the introduction of incriminating evidence resulting from his arrest was not circumscribed." *Billiot v. Maggio,* 694

F.2d 98, 100 (5th Cir.1982). *Stone* bars relitigation of the issue here.

Penry also argues that his confession was involuntary and that he did not voluntarily waive his *Miranda* rights. Most of Penry's argument on both issues centers on his low intellect and inability to freely confess or waive his rights. However, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* —— U.S. ——, ——, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). Similarly, *"Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Connelly,* 107 S.Ct. at 524. We have carefully examined the record, as is our duty, *see Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (ultimate question of voluntariness of confession subject to plenary review by federal habeas court), and can find no evidence of police misconduct that would taint the confessions or waiver of rights. Both the confession and waiver of *Miranda* rights were voluntary.

Penry also challenges the exclusion of one venireman for cause. Citing *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the state argues that Penry procedurally defaulted on the issue. When the state court opinion is silent as to whether it used the procedural bar,

> this Court will consider "whether the state court has used procedural default in similar cases to preclude review of the claim's merits, whether the history of the case would suggest that the state court was aware of the procedural default, and whether the state court's opinions suggest reliance upon procedural grounds or a determination of the merits."

*Ortega v. McCotter,* 808 F.2d 406, 408 (5th Cir.1987) (quoting *Preston v. Maggio,* 705 F.2d 113, 116 (5th Cir.1983)). In the state habeas claim here, the only time that issue was raised, the state court simply denied the writ without an opinion. However,

Texas has consistently applied a procedural bar to exclusion of veniremen without objection. *Hawkins v. State*, 660 S.W.2d 65, 82 (Tex.Crim.App.1983). Similarly, the state court was aware of the procedural bar in this case since the state raised the bar in its reply to Penry's state habeas claim. Therefore, under the *Preston* test, the claim is barred if Penry failed to object to the exclusion at trial.

At trial, Penry's counsel originally objected to the state's motion to exclude the venireman for cause. However, after a number of attempts at rehabilitation, counsel withdrew his objection and the challenge for cause was granted. Penry argues that the attorney's argument was not "an expressed withdrawal of the objection but a statement of resignation to the fact that the Court was going to grant the State's challenge for cause in spite of the objection." We disagree. Our reading of that part of the voir dire convinces us that counsel did expressly withdraw his objection. He did so "regretfully" because he wanted the juror but knew that the juror could not be rehabilitated. The *Sykes* bar precludes our consideration of the merits of the issue.

### III.

### A.

The jury rejected Penry's insanity defense and found him guilty of capital mur-

der.[1] The Texas bifurcated statutory scheme then provides for the jury to decide the sentence by answering three "Special Issues":

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Tex.Crim.Proc.Code Ann. art. 37.071(b) (Vernon 1981 & Supp.1987). If the jury unanimously answers "yes" to all three questions, the court must sentence the defendant to death. Tex.Crim.Proc.Code Ann. art. 37.071(c)-(e) (Vernon 1981 & Supp. 1987). Otherwise, the defendant must be sentenced to life imprisonment. *Id.* Here, additional evidence was introduced in the sentencing phase. The jury was then instructed, *inter alia*:

You are further instructed that in determining each of these Special Issues you may take into consideration all of the evidence submitted to you in the full trial of the case, that is, all of the evidence submitted to determine the guilt or inno-

1. At the time of Penry's offense, section 19.03 of the Texas Penal Code Ann. (Vernon 1974) provided:

(a) A person commits an offense [of capital murder] if he commits murder as defined under Section 19.02(a)(1) of this code and:

(1) the person murders a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person knows is a peace officer or fireman;

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson;

(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration;

(4) the person commits the murder while escaping or attempting to escape from a penal institution; or

(5) the person, while incarcerated in a penal institution, murders another who is employed in the operation of the penal institution.

Penry was found guilty of a violation of subsection (a)(2), "in the course of committing and attempting to commit the offense of aggravated rape." *Penry v. State*, 691 S.W.2d at 641.

Subsequent amendments have changed "aggravated rape" to "aggravated sexual assault" and have added:

(6) the person murders more than one person:

(A) during the same criminal transaction; or

(B) during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct.

Texas Penal Code Ann. § 19.03 (Vernon Supp. 1987).

cence of the defendant, and all of the evidence, if any, admitted before you in the second part of the trial wherein you are called upon to determine the answers to Special Issues hereby submitted to you.

The jury instructions then proceeded to list, without definition, the three special issues with names of the defendant and decedent inserted.

Penry objected to the jury charge. He complained that the court failed to define "deliberately," "probability," "criminal acts of violence" and "continuing threat to society." He also objected that the court failed to instruct the jury to weigh aggravating and mitigating circumstances and failed to authorize a discretionary grant of mercy based on the existence of mitigating circumstances.

The objections were overruled and the jury answered "yes" to all three special issues. Penry was sentenced to death. On direct appeal, the Texas Court of Criminal Appeals rejected Penry's objections to the jury charge. *Penry v. State,* 691 S.W.2d at 653–54. The court held that the words used in the special issues need not be defined because the jury could understand the words' common meaning. *Id.* With respect to Penry's argument on weighing of aggravating/mitigating circumstances, the court stated that

> it has in effect been answered by the Supreme Court's opinion in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), upholding this State's statutory scheme for imposing capital murder. Our statutory scheme allows for broad consideration of aggravating and mitigating factors. V.T.C.A. Penal Code, Sec. 19.03 ensures that imposition of the death sentence is not even a possibility if certain aggravating circumstances are not proven beyond a reasonable doubt by the State.

Defendants are allowed to present all possible relevant mitigating information at the punishment hearing, as part of the effort to aid the jury in answering the special issues.

> Defense counsel is allowed to argue against the death penalty in general, or its imposition in the particular case at hand in light of all relevant mitigating factors. In sum, the Texas death penalty scheme passes constitutional muster despite failure to require the jury to find that aggravating factors outweigh mitigating ones.

*Id.* at 654.

The jury was allowed to hear all evidence that might mitigate the culpability of Penry's deeds or his person. The jury could then consider (i.e. *think about*) the bearing of all of the evidence, aggravating and mitigating, upon the ultimate question of whether Johnny Paul Penry should be put to death. If, however, that consideration should lead the jury to decide against the death sentence, how is the decision given effect and incorporated into the verdict? No interrogatory asks about that most crucial decision. Having said that it was a deliberate murder and that Penry will be a continuing threat, the jury can say no more. The court, following Texas law, ends the matter and orders death. It is difficult to see how this procedure accords with some of the Supreme Court's writings on the Eighth Amendment's mandate of individualized application of all mitigation along with aggravation in the sentencing decision. In order to explain our concern, we must look further at the Supreme Court's writings on capital punishment.

**B.**

The Supreme Court, in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), laid the foundations for the post-*Furman* [2] era of capital punishment. The plurality [3] in *Gregg* held that the Georgia

---

**2.** *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *Furman* effectively struck down all capital punishment statutes in place at that time.

**3.** Only three members of the Court, Justices Stewart, Powell and Stevens, were in the majority in *Gregg* as well as the four other death penalty cases decided that day. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct.

capital punishment statute was constitutional. 428 U.S. at 207, 96 S.Ct. at 2941. That statute provided for a bifurcated trial with the guilt/innocence phase followed by a punishment stage. *Id.* at 195, 96 S.Ct. at 2935. At the punishment stage, the jury had to find at least one aggravating circumstance before it could impose the death penalty. *Id.* at 197, 96 S.Ct. at 2936. Additionally, at the punishment phase, the jury could consider any other aggravating or any mitigating circumstances before imposing either death or life imprisonment. *Id.*

Although the Court warned that "each distinct system must be examined on an individual basis," *id.* at 195, 96 S.Ct. at 2935, two basic principles stand out. First, in order to pass constitutional muster, the sentencer's [4] discretion must be narrowed. That can be accomplished by the finding of aggravating circumstances either about the crime or the defendant involved. Second, the sentencer must consider the circumstances and the defendant involved. That is usually done through consideration of mitigating circumstances.

The other four cases decided on the same day as *Gregg* all involved application of the two basic principles. In *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), the Court struck down a North Carolina law that mandated the death penalty for "a broad category of homicidal offenses." 428 U.S. at 287, 96 S.Ct. at 2983. The Court found that one of the statute's "constitutional shortcoming[s]" was that it failed "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Id.* at 303, 96 S.Ct. at 2991. Likewise, the Louisiana mandatory death penalty, even though it was considerably narrower than North Carolina's and provided for jury instruction on lesser included offenses even if not warranted by the evidence, was, for similar reasons, found to be unconstitutional. *Roberts v. Louisiana,* 428 U.S. 325, 332, 335–36, 96 S.Ct. 3001, 3005, 3007, 49 L.Ed.2d 974 (1976).

The Florida statute was considered by the Court in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). That statute, similar to Georgia's, required the sentencer (the judge with an advisory jury) to weigh eight enumerated aggravating circumstances against seven enumerated mitigating circumstances. *Id.* at 251, 96 S.Ct. at 2966. The Court found the statute constitutional since the aggravating factors serve to narrow the focus on the crime and the mitigating factors force the sentencer to "focus on the individual circumstances of each homicide and each defendant." *Id.* at 252, 96 S.Ct. at 2966.

The Court, on the same day as *Gregg, Proffitt, Roberts,* and *Woodson,* considered the Texas statute at issue here. The Court first held that the Texas definition of capital murder in § 19.03 was the equivalent of finding "a statutory aggravating circumstance before the death penalty may be imposed." *Jurek v. Texas,* 428 U.S. 262, 270, 96 S.Ct. 2950, 2956, 49 L.Ed.2d 929 (1976). The Court then addressed the issue of mitigating circumstances:

> But a sentencing system that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination that we today have held in *Woodson v. North Carolina* to be required by the Eighth and Fourteenth Amendments. For such a system would approach the mandatory laws that we today hold unconstitutional in *Woodson* and *Roberts v. Louisiana.* A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.

> Thus, in order to meet the requirement of the Eighth and Fourteenth Amend-

---

2960, 49 L.Ed.2d 913 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). Those opinions, as confirmed by subsequent decisions, represent the law involved.

4. The sentencer may be a judge instead of a jury. *See* discussion concerning *Proffitt, infra* p. 921.

ments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances. In *Gregg v. Georgia,* we today hold constitutionally valid a capital-sentencing system that directs the jury to consider any mitigating factors, and in *Proffitt v. Florida* we likewise hold constitutional a system that directs the judge and advisory jury to consider certain enumerated mitigating circumstances. The Texas statute does not explicitly speak of mitigating circumstances; it directs only that the jury answer three questions. Thus, the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors.

The second Texas statutory question asks the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" if he were not sentenced to death. The Texas Court of Criminal Appeals has yet to define precisely the meanings of such terms as "criminal acts of violence" or "continuing threat to society." In the present case, however, it indicated that it will interpret this second question so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show:

> In determining the likelihood that the defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record. It could consider the range and severity of his prior criminal conduct. It could further look to the age of the defendant and whether or not at the time of the commission of the offense he was acting under duress or under the domination of another. It could also consider whether the defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity, but more than the emotions of the average man, however inflamed, could withstand. 522 S.W.2d, at 939–940.

*Id.* at 271–73, 96 S.Ct. at 2956–57 (citations and footnotes omitted). The Court then concluded:

> Thus, Texas law essentially requires that one of five aggravating circumstances be found before a defendant can be found guilty of capital murder, and that in considering whether to impose a death sentence the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it. It thus appears that, as in Georgia and Florida, the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.

*Id.* at 273–74, 96 S.Ct. at 2957 (footnotes omitted).

We have no doubt that the Texas statute sufficiently narrows the circumstances in which death is imposed. Instead, we are concerned with *Gregg's* second part; the individual consideration of the circumstances of the crime and the character of the individual. That law has not been stagnant since *Gregg.* The Supreme Court has developed what is meant by individualized consideration.

Two years after *Gregg,* the Court considered an Ohio capital punishment statute that required the death penalty unless one of three narrowly drawn mitigating circumstances was present. *Lockett v. Ohio,* 438 U.S. 586, 593–94, 98 S.Ct. 2954, 2959, 57 L.Ed.2d 973 (1978). The Court found the statute unconstitutional, holding

> that the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Id.* at 604, 98 S.Ct. at 2964–65 (emphasis in original).

In *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982), the defendant, 16 years old at the time of the murder, offered evidence of his trou-

bling family background and his emotional disturbance. In sentencing Eddings to death, the trial judge stated that " 'in following the law,' he could not 'consider the fact of this young man's violent background.' " *Id.* at 112–13, 102 S.Ct. at 876. The Court found that the sentencing violated the rule in *Lockett:*

> Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

*Id.* at 113–15, 102 S.Ct. at 876–77 (footnotes omitted).

After *Eddings,* the Court has made clear that the range of mitigating factors that must be considered is very wide. For example, in *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the Court reversed a death sentence because the trial court refused to allow evidence of Skipper's good adjustment to prison. Since that relevant mitigating evidence was excluded the Court reversed on *Eddings* grounds. *Skipper,* 476 U.S. at ——, 106 S.Ct. at 1673.

The most recent Supreme Court case to look at mitigating evidence was *Hitchcock v. Dugger,* —— U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). In that case, the defendant Hitchcock introduced evidence of consequences of his childhood habit of inhaling gas fumes, together with other misfortunes of his youth. *Hitchcock,* 107 S.Ct. at 1823–24. The court of appeals affirmed the denial of habeas relief holding that the presentation of the evidence and Hitchcock's attorney's argument to "consider the whole picture, the whole ball of wax," was sufficient to show that he had "an individualized sentencing hearing." *Hitchcock v. Wainwright,* 770 F.2d 1514,

1518 (11th Cir.1985) (en banc), *rev'd sub nom., Hitchcock v. Dugger,* —— U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). A unanimous Supreme Court reversed. *Hitchcock,* 107 S.Ct. at 1821. Instead of looking to what evidence was presented to the jury and the argument of defense counsel, the Court focused on the jury instructions and the prosecutor's argument. *Id.* at 1823–24. The Florida statute at the time of trial provided for consideration of certain enumerated aggravating circumstances and certain enumerated mitigating circumstances. *Id.* at 1822–23. Although there was some doubt whether the Florida statute prohibited the use of nonstatutory mitigating circumstances, the court did not address the issue "[b]ecause our examination of the sentencing proceedings actually conducted in this case convinces us that the sentencing judge assumed such a prohibition and instructed the jury accordingly...." *Id.* at 1823. The Court focused on both the prosecutor's argument and the jury instructions. The prosecutor told the jury "to consider the mitigating circumstances and consider those by number," and he went down the list item by item. *Id.* at 1824. The trial judge instructed the jury that "[t]he mitigating circumstances which you may consider shall be the following" and then listed the statutory mitigating circumstances. *Id.* at 1824. The Court concluded: "[w]e think it could not be clearer that the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances, and that the proceedings therefore did not comport with the requirements of *Skipper v. South Carolina, Eddings v. Oklahoma,* and *Lockett v. Ohio.*" *Id.* (citations omitted).

 It is therefore abundantly clear that a sentencing authority must not be precluded from considering any, or almost any, mitigating evidence. The issue here is what the term "consider" means. The Supreme Court has held that presentation of mitigating circumstances to the sentencing authority is not enough: "[n]ot only did the Eighth Amendment require that capital-sentencing schemes permit the defendant

to present any relevant mitigating evidence, but '*Lockett* requires the sentencer to listen' to that evidence." *Sumner v. Shuman,* —— U.S. ——, ——, 107 S.Ct. 2716, 2722, 97 L.Ed.2d 56 (1987) (quoting *Eddings,* 455 U.S. at 115, n. 10, 102 S.Ct. at 877, n. 10). We read the Court's command that the sentencer not be precluded from "considering" any mitigating circumstances to mean that the sentencer not be precluded from listening to and acting upon any mitigating circumstance. That is not to say that the aggravating and mitigating circumstances must be balanced in any particular way. *See Zant v. Stephens,* 462 U.S. 862, 873–80, 103 S.Ct. 2733, 2741–44, 77 L.Ed.2d 235 (1983). It is simply to say that the jury may not be precluded from allowing the evidence of mitigation to enter into their decision.

The Supreme Court, in effect, has approached capital cases from two different ends. First, "a State must 'narrow the class of murderers subject to capital punishment,' by providing 'specific and detailed guidance' to the sentencer." *McCleskey v. Kemp,* —— U.S. ——, ——, 107 S.Ct. 1756, 1772–73, 95 L.Ed.2d 262 (1987) (citations omitted) (citing *Gregg,* 428 U.S. at 196, 96 S.Ct. at 2936 and *Proffitt,* 428 U.S. at 253, 96 S.Ct. at 2967). On the other side, "the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." *McCleskey,* 107 S.Ct. at 1773; *see also Shuman,* 107 S.Ct. at 2723 (Eighth Amendment violated by statute that requires the death sentence for defendant who murders while serving a life sentence without the possibility of parole); *see generally California v. Brown,* —— U.S. ——, ——, 107 S.Ct. 837, 841–42, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring) (discussing the "tension" between "the two central principles of our Eighth Amendment jurisprudence").

Turning back to the Texas sentencing procedure, we see that the jury is to respond to three "special issues." The third issue involves provocation by the deceased.

Tex.Crim.Proc.Code Ann. art. 37.071(b). It rarely enters into the decision of the jury. Instead, the focus is on the first two questions: whether the killing was deliberate with the reasonable expectation that death would follow and whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.Crim.Proc.Code Ann. art. 37.071(b). The Texas Court of Criminal Appeals has consistently held that the words of these special issues have clear meanings that need no definition. *Penry,* 691 S.W.2d at 653–54. The jury is instructed, as here, that in answering "each Special Issue you may take into consideration all of the evidence...." No jury instruction on mitigating evidence is necessary because "[t]he jury can readily grasp the logical relevance of mitigating evidence to the issue of whether there is a probability of future criminal acts of violence." *Cordova v. State,* 733 S.W.2d 175, 190 (Tex.Crim.App. 1987) (quoting *Quinones v. State,* 592 S.W.2d 933, 947 (Tex.Crim.App.), *cert. denied,* 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980)).

The issue, then, is whether the questions, within their common meaning, permit the jury to act on all of the mitigating evidence in any manner they choose. In other words, is the jury precluded from the individual sentencing consideration that the Constitution mandates? The jury may only find whether the murder was deliberate with a reasonable expectation of death and whether there is a probability that the defendant will in the future commit criminal acts of violence that constitute a threat to society. Although most mitigating evidence might be relevant in answering these questions, some arguably mitigating evidence would not necessarily be. The jury, then, would be effectively precluded from acting on the latter. Actually, these questions are directed at additional aggravating circumstances. Once found beyond a reasonable doubt, the death penalty is then mandatory.[5] The jury cannot say, based

---

5. Commentators have expressed similar views.

*See* Benson, *Texas Capital Sentencing Procedure*

on mitigating circumstances, that a sentence less than death is appropriate. How can a jury act on its "discretion to consider relevant evidence that might cause it to *decline to impose* the death penalty"? *McCleskey*, 107 S.Ct. at 1773. Where, in the Texas scheme is the "moral inquiry" of the "individualized assessment of the appropriateness of the death penalty"? *Brown*, 107 S.Ct. at 841 (O'Connor, J., concurring).

We recognize that *Jurek* specifically upheld the Texas statute, as the state argues. Developing Supreme Court law, however, recognizes a constitutional right that the jury have some discretion to decline to impose the death penalty. There is a question whether the Texas scheme permits the full range of discretion which the Supreme Court may require.[6] Perhaps, it is time to reconsider *Jurek* in light of that developing law.[7]

Penry's conviction is a good example of mitigating circumstances that pose a problem under the Texas scheme. Penry introduced evidence of his mental retardation and his inability to read or write. He had never finished the first grade. His emotional development was that of a child. He had been beaten as a child, locked in his room without access to a toilet for considerable lengths of time. He had been in and out of a number of state schools. One effect of his retardation was his inability to learn from his mistakes.

The evidence is similar to that in *Hitchcock* and *Eddings*. Those cases arguably teach us that it must be considered by the sentencer. Yet the Penry jury was allowed only to answer two questions. First, was the killing deliberate with reasonable expectation of death. Having just found Penry guilty of an intentional killing, and rejecting his insanity defense, the answer to that issue was likely to be yes. Although some of Penry's mitigating evidence of mental retardation might come into play in considering deliberateness, a major thrust of the evidence on his background and child abuse, logically, does not. The second question then asked whether Penry would be a continuing threat to society. The mitigating evidence shows that Penry could not learn from his mistakes. That suggests an affirmative answer to the second question. What was the jury to do if it decided that Penry, because of retardation, arrested emotional development and a troubled youth,[8] should not be executed? If anything, the evidence made it more likely, not less likely, that the jury would answer the second question yes. It did not allow the jury to consider a major thrust of Penry's evidence as *mitigating* evidence. We do not see how the evidence of Penry's arrested emotional development and troubled youth could, under the instructions and the special issues, be fully acted upon by the jury. There is no place for the jury to say "no" to the death penalty based on a principal mitigating force of those circumstances.

The state argues that Penry's counsel could, and did, argue the mitigating circumstances to the jury. The defense attorney in *Hitchcock* also argued to the jury to "consider the whole picture, the whole ball of wax." 107 S.Ct. at 1824. The prosecu-

*After Eddings: Some Questions Regarding Constitutional Validity*, 23 S.Tex.L.J. 315 (1982); Green, *Capital Punishment, Psychiatric Experts, and Predictions of Dangerousness*, 13 Capital U.L.Rev. 533 (1984). Green argues that once the prosecutor's psychiatrist pronounces a defendant a sociopath, as usually happens, the answer to the future dangerousness issue is preordained. *Id.* at 553.

**6.** Justice White, concurring in part, dissenting in part and concurring in the judgment in *Lockett* states, "[i]t ... seems to me that the plurality strains very hard and unsuccessfully to avoid eviscerating the handiwork in *Proffitt v. Florida* and *Jurek v. Texas....*" *Lockett*, 438 U.S. at 623,

98 S.Ct. at 2983 (citations omitted). It was the same Florida statute that was approved in *Proffitt* that was applied unconstitutionally in *Hitchcock*.

**7.** The United States Supreme Court has recently granted certiorari in *Franklin v. Lynaugh*, 823 F.2d 98 (5th Cir1987), *cert. granted*, 56 U.S.L.W. 3287 (U.S. Oct. 9, 1987) (No. 87–5546), limited to the question:

Whether the jury must be instructed on the effect of mitigating evidence under the Texas capital punishment scheme.

**8.** Penry, apparently, was approximately 22 years old at the time of the crime.

tor in *Hitchcock* then stood up and argued to the jury to consider the mitigating circumstances by number. *Id.* Likewise, here, the prosecutor was able to trump the defense counsel's argument:

> I didn't hear Mr. Newman or Mr. Wright [defense attorneys] say anything to you about what your responsibilities are. In answering these questions based on the evidence and following the law, and that's all that I asked you to do, is go out and look at the evidence. The burden of proof is on the State as it has been from the beginning, and we accept that burden. And I honestly believe that we have more than met that burden, and that's the reason you didn't hear Mr. Newman argue. He didn't pick out these issues and point out to you where the State had failed to meet this burden. He didn't point out the weaknesses in the state's case because, ladies and gentlemen, I submit to you we've met our burden.

As in *Hitchcock*, the mere fact that defense counsel argued mitigating circumstances does not conclude the matter. The question is whether the jury could act on the mitigating circumstances and not impose the death penalty. The prosecutor's argument would exclude that consideration.

### C.

*Jurek* expressly held that the Texas statute is constitutional. After *Jurek*, the Court has reiterated that stance a number of times. For example, in *Lockett* the Court stated that the Texas statute "survived the petitioner's Eighth and Fourteenth Amendment attack because three Justices concluded that the Texas Court of Criminal Appeals had broadly interpreted the second question—despite its facial narrowness—so as to permit the sentencer to consider 'whatever mitigating circumstances' the defendant might be able to show." *Lockett*, 438 U.S. at 607, 98 S.Ct. at 2966. Similar reasoning has been used in a number of other cases. *See, e.g., Zant*, 462 U.S. at 875 n. 13, 103 S.Ct. at 2742 n. 13; *Lockhart v. McCree*, 476 U.S. 162, ——, 106 S.Ct. 1758, 1769–70, 90 L.Ed.2d 137

(1986). We think that a strong argument can be made that developing law, *see, e.g., Hitchcock*, is inconsistent. However, even if we were free to decide that inconsistency and reach a different result, *see Brock v. McCotter*, 781 F.2d 1152, 1157 n. 5 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986), we are not free to do so because prior Fifth Circuit decisions have rejected claims similar to Penry's. *Riles v. McCotter*, 799 F.2d 947, 952–53 (5th Cir.1986); *Granviel v. Estelle*, 655 F.2d 673, 675–77 (5th Cir.1981), *cert. denied*, 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982). These prior panel holdings bar a different holding by us.

### IV.

The stay of execution is vacated. The judgment denying the writ is AFFIRMED.

GARWOOD, Circuit Judge, concurring:

I join Judge Reavley's thoughtful opinion, and append these remarks merely to further explore, from what may be my slightly different perspective, some of the possible ramifications of *Jurek* and its relationship to other Supreme Court decisions of the kind called attention to by Judge Reavley.

Undoubtedly, as Judge Reavley so cogently explains, there is a tension between the two major themes of the Supreme Court's recent capital sentencing jurisprudence, and it is certainly not inconceivable that the ultimate resolution of that tension may undermine *Jurek*. However, I do not understand us to suggest, and I do not believe, that such a result is either inevitable or desirable.

That the Court knew what it was doing in *Jurek* must be assumed not only out of proper respect for the Court, but also because of the concurring opinion therein of Justice White (joined by the Chief Justice and Justice Rehnquist), as well as Justice White's dissent (joined by the Chief Justice and Justices Blackmun and Rehnquist) in *Roberts* (Stanislaus) *v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974

(1976), and Justice Rehnquist's dissent in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), each decided the same day as *Jurek*. Justice White's *Jurek* concurrence observed that the Texas "statute does not extend to juries discretionary power to dispense mercy." 96 S.Ct. at 2959. His dissent in *Roberts* points out that under the Texas statute upheld in *Jurek*, "capital punishment is required if the defendant is found guilty of the crime charged and the jury answers two additional questions in the affirmative. Once that occurs, no discretion is left to the jury; death is mandatory." 96 S.Ct. at 3018. And, in *Woodson*, Justice Rehnquist's dissent points out that under the Texas system upheld in *Jurek*, "[t]he jury is required to answer three statutory questions. If the questions are unanimously answered in the affirmative, the death penalty *must* be imposed." 96 S.Ct. at 2996 (emphasis in original). It is true, of course, that Justice Stewart's plurality opinion in *Jurek* relied heavily on the breadth of circumstances which the Texas Court of Criminal Appeals in *Jurek* itself (as well as in another case) had indicated could properly be considered in answering the sentencing special interrogatories, particularly the second. 96 S.Ct. 2950 at 2956–57. However, it is to be noted in this connection that the Texas courts, both generally and in Penry's case, have kept the promise of *Jurek*, and have not to any extent narrowed the circumstances appropriate for consideration under the sentencing special issues as indicated in *Jurek*.

Moreover, *since Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)—the decision most in tension with *Jurek*—the Supreme Court has cited *Jurek* favorably in numerous cases. *See Sumner v. Shuman*, —— U.S. ——, 107 S.Ct. 2716, 2721, 97 L.Ed.2d 56 (1987); *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 1770, 90 L.Ed.2d 137 (1986); *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986); *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 876, 879, 79 L.Ed.2d 29 (1984) (declining to "effectively overrule *Jurek*"); *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 3453–54, 77 L.Ed.2d

1171 (1983); *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 3396, 77 L.Ed.2d 1090 (1983); *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983). *See also Tison v. Arizona*, —— U.S. ——, 107 S.Ct. 1676, 1687, 95 L.Ed.2d 127 (1987) (citing *Selvage v. State*, 680 S.W.2d 17, 22 (Tex.Crim.App.1984)). As reflected below, *Jurek* was likewise frequently cited with approval prior to *Eddings*. *See also, e.g., Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 2524 n. 1, 65 L.Ed.2d 581 (1980).

The scope of those more recent Supreme Court decisions which are in tension with *Jurek* is not entirely clear respecting what considerations the sentencer must be allowed to take into account in determining the appropriateness of a death sentence. In Penry's case, not only was the jury plainly allowed to hear and instructed to consider *all* evidence proffered, but also the special issues submitted adequately allowed the jurors to give effect to this evidence insofar as they might deem it relevant either to the moral culpability of Penry's own conduct and state of mind on the particular occasion in question or to his possible rehabilitation or future dangerousness to society. What the special issues did not afford the jury a vehicle for giving effect to was Penry's implicit plea that, although his own individual actions and state of mind on the occasion in question were morally culpable and although his character generally was such that he was not a good prospect for rehabilitation and would pose a continuing danger to society, *nevertheless* he was not to blame either for his own thus unsatisfactory character, or for his own immoral conduct and state of mind on the occasion in question, *because* these were products of his tragically disadvantaged youth. It is not entirely clear that the Supreme Court's decisions respecting individualized consideration of the offense and offender have gone so far as to require that effective consideration always be given by the sentencer to such a plea.

The initial individualized consideration cases, *Woodson* and *Roberts* (Stanislaus), were decided the same day as *Jurek*. They

each involved mandatory capital sentences for certain general categories of homicide. In *Roberts,* the Court decried the Louisiana statute's "lack of focus on the circumstances of the particular offense and the character and propensities of the offender." 96 S.Ct. at 3006. In *Woodson,* the Court noted that the North Carolina statute, which embraced the felony murder doctrine, "accords no significance to *relevant facets* of the character and record of the individual offender or the circumstances of the particular offense." 96 S.Ct. at 2991 (emphasis added). Neither criticism is substantially applicable to *Jurek.* In *Roberts* (Harry) *v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977), decided the following year, another mandatory capital sentencing scheme was struck down. The Court observed: "Circumstances such as the youth of the offender, the absence of any prior conviction, the influence of drugs, alcohol, or extreme emotional disturbance, and *even* the existence of circumstances which the offender *reasonably* believed provided a moral justification for his conduct are all examples of mitigating facts which might attend the killing of a peace officer" but which the Louisiana statute did not take into account. *Id.* at 1995 (emphasis added). Again, *Jurek* is not subject to this criticism. These statutes all had in common the prohibition of any considerations other than guilt of the particular offense.

The Court first went beyond that category of case the next year in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), which involved a death sentence imposed on a twenty-one-year-old woman who was an accomplice to the murder but did not actually kill the victim. There was evidence that " 'her prognosis for rehabilitation' ... was favorable," and she had no major offenses on her record. *Id.* at 2959. The sentencing statute was held invalid because it "did not permit the sentencing judge to consider, as mitigating factors, her character, prior record, age, lack of specific intent to cause death, and her relatively minor part in the crime." *Id.* at 2961. Particular reliance was placed on *Woodson,* and *Jurek* was cited with apparent approval. *Id.* at 2963. Justice Black-

mun limited his concurrence to cases where the death sentence was imposed on "a defendant who only aided and abetted a murder, without permitting any consideration by the sentencing authority of the extent of her involvement, or the degree of her *mens rea,* in the commission of the homicide." *Id.* at 2969. Justice Marshall, in his concurrence, pointed out that the defendant "was sentenced to death for a killing that she did not actually commit or intend to commit" and that the Ohio statute "precluded any effective consideration of her degree of involvement in the crime, her age, or her prospects of rehabilitation." *Id.* at 2972.

It is apparent that none of the considerations which *Lockett* held must be taken into account in determining whether a sentence of death should be imposed, were precluded from being given effective consideration by the jury in Penry's case. Each of these considerations is relevant to either the first or second sentencing inquiry under the Texas scheme as announced in *Jurek* and applied in this case.

It is also to be noted that Justice White concurred in the result in *Lockett* on substantive grounds, namely, that the Eighth Amendment prohibited capital punishment for one who did not intend the death of the victim. *Id.* at 2983. This view was largely vindicated in *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), where the Court held that the death sentence could not constitutionally be imposed on one who did not kill or attempt to kill or have any intention of participating in or facilitating a killing. *Id.* at 3377. *Enmund* placed principal reliance on *Lockett* and *Woodson. Id.* The *Enmund* Court noted that "Enmund's own conduct" must be the basis for punishment and "[t]he focus must be on *his* culpability." *Id.* (emphasis in original). Consideration of the deterrence justification for punishment made defendant's state of mind particularly relevant. *Id.* The Court observed that "[a]s for retribution as a justification for executing Enmund, we think this very much depends on the degree of Enmund's culpability—what Enmund's intentions, ex-

pectations, and actions were," and that "Enmund's criminal culpability must be limited to participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt." *Id.* at 3378. In these passages, the Court is obviously measuring personal responsibility and moral guilt *by the circumstances of the particular offense* and the defendant's participation and state of mind *with reference to it.* These considerations appear to be adequately taken into account in the Texas sentencing scheme. The *Enmund* analysis was reconfirmed in *Tison*, 107 S.Ct. at 1683, 1687.

Likewise, in other cases where the Supreme Court has struck down a capital sentencing scheme because of its mandatory nature or its preclusion of consideration of mitigating factors, a significant and perhaps crucial aspect of the decision has been that matters relating to the accused's own participation in the crime, or his own state of mind in respect to it, or his potential for rehabilitation or lack of future dangerousness, have been deemed legally irrelevant. Thus, in *Skipper,* the Court held that it was constitutional error to exclude evidence relevant to the accused's "probable future conduct if sentenced to life in prison," and that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." 106 S.Ct. at 1671. This was stated to be merely the converse of *Jurek. Id. See also Wainwright v. Goode,* 464 U.S. 78, 104 S.Ct. 378, 382–83, 78 L.Ed.2d 187 (1983) (relevance of future dangerousness). In *Hitchcock v. Dugger,* —— U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), a death sentence was set aside because the trial court deemed that it was legally barred from taking any account of certain considerations which the defendant offered in mitigation including, as the court twice mentioned, "his potential for rehabilitation" or "his capacity for rehabilitation." *Id.* at 1824. The Court noted that "the exclusion of mitigating evidence *of the sort at issue here* renders the death sentence invalid," and further observed, quoting *Skipper,* that a capital defendant must be " 'permitted to present any and all *relevant* mitigating evidence that is available.' " *Id.* (emphasis added). Most recently, in *Sumner,* the Court struck down Nevada's mandatory death sentence for those committing first degree murder while under a sentence to life imprisonment without possibility of parole. The Court noted that its prior decisions, including *Enmund* and *Tison,* established that "the level of criminal responsibility of a person convicted of murder may vary according to the extent of that individual's participation in the crime," and that this consideration was not adequately reflected in the Nevada statute. 107 S.Ct. at 1724. *Sumner* also noted as a possible mitigating factor excluded by the Nevada law " '*even* the existence of circumstances which the offender *reasonably* believed provided a moral justification for his conduct.' " 107 S.Ct. at 2725 (quoting *Roberts* (Harry)) (emphasis added). The *Sumner* Court went on to observe that in the case before it a possible mitigating factor which the Nevada law ignored was the defendant's "behavior during his 15 years of incarceration, including whether the inmate murder was an isolated incident of violent behavior or merely the most recent in a long line of such incidents." *Id.* at 2726. These factors are clearly consistent with *Jurek,* which, as previously noted, *Sumner* cites with approval.

Of all the cases in this area, *Eddings* is most in tension with *Jurek. Eddings* is certainly susceptible of the reading that considerations respecting a defendant's disadvantaged background, of the sort that Penry sought to have the jury give effect to at his sentencing hearing, may not be deemed legally irrelevant. *Eddings* observed that the sixteen-year-old defendant "had been deprived of the care, concern and parental attention that children deserve," and that "the background and mental and emotional development of a youthful defendant [must] be duly considered in sentencing." 102 S.Ct. at 877. However, it is not entirely clear that as broad a reading as this language considered in isolation suggests must be given to *Eddings.* There the sentencing authority would, as a matter of law, consider as a mitigating

factor *nothing* except Eddings' chronological youth. *Id.* at 873–74. The Court's opinion further points out that there was testimony from a sociologist "that Eddings was treatable," and from a psychiatrist "that, if treated, Eddings would no longer pose a threat to society." *Id.* at 873. It likewise noted a psychologist's testimony that Eddings had a sociopathic or antisocial personality, but that "approximately 30% of youths suffering from such a disorder grew out of it as they aged." *Id.* Apparently the Oklahoma sentencing authorities also deemed all this evidence legally irrelevant. Certainly the potential for rehabilitation, and the fact that a person can be treated so that he will not be a danger to society, or is youthful so may grow out of his difficulties, may be effectively considered under the Texas scheme. That the Court mentioned this evidence in some detail in *Eddings* suggests that it thought it significant. Justice Powell wrote the majority opinion in *Eddings* and Chief Justice Burger and Justices White, Blackmun, and Rehnquist dissented. In *Skipper*, on the other hand, Justice White, who had dissented in *Eddings*, wrote the majority opinion and Justice Powell, with whom the Chief Justice and Justice Rehnquist joined, dissented on the point relevant here (although they concurred in the result on other grounds). This would appear to indicate that the Court has not fully crystallized its view on this subject.

The foregoing review of the Court's leading opinions in the area suggests that not every aspect of whatever is offered by the defense as being in mitigation must constitutionally be given effective consideration by the sentencer. As observed, the Court has referred to "relevant" mitigating evidence, "reasonably" believed moral justification, and the "relevant" facets of the character and record of the defendant. In *California v. Brown*, — U.S. —, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the Court refused to reverse on account of an instruction that the jury could not be swayed by "sympathy" or "mere sympathy." The *Brown* Court did not regard such an instruction as inconsistent with the rule that "the capital defendant generally must be allowed to introduce any *relevant* mitigating evidence regarding his ' "character or record and any of the circumstances of the offense." ' " *Id.* at 839 (quoting *Eddings* quoting *Lockett;* emphasis added).

Note must also be taken of the other principal recent theme in the Supreme Court's capital punishment jurisprudence, namely, that "sentencers may not be given unbridled discretion in determining the fate of those charged with capital offenses." *Brown*, 107 S.Ct. at 839. This, of course, stems from the concurring opinions of Justices Douglas, Stewart, and White in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 2727, 2760, 2763, 33 L.Ed.2d 346 (1972). In *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the Court struck down a threshold aggravating circumstance as being overly vague. The plurality noted that this violated its warning in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859 (1976), that such vague standards would "fail adequately to channel the sentencing decision *patterns* of juries with the result that a *pattern* of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur." *Godfrey*, 100 S.Ct. at 1765 (quoting *Gregg;* emphasis added) (*Jurek* is also cited approvingly, 100 S.Ct. at 1764). In *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), where the Court held that jury sentencing was not required for capital cases, it explicated this theme as follows:

> "If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Id.* at 3162.

The Court further observed that "the discretion of the sentencing authority, whether judge or jury, must be limited and reviewable." *Id.* at 3163. Moreover, "[t]here must be a valid penological reason for choosing from among the many criminal defendants the few who are sentenced to death." *Id.* at 3162 n. 7.

However, in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the crucial plurality opinion by Justice Stewart, joined by Justices Powell and Stevens, had observed that "the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced *under a system that does not create a substantial risk of arbitrariness or caprice.*" *Id.* at 2939 (emphasis added). In this connection, in *Zant* the Court noted that it did not require jury instructions providing "specific standards to guide the jury's consideration of aggravating and mitigating circumstances." 103 S.Ct. at 2742. And, as the concurring opinion of Justice Stevens, joined by Justice Powell, in *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 3431 n. 2, 77 L.Ed.2d 1134 (1983), recognized, neither *Lockett* nor *Eddings* established that any particular weight need be given by the sentencer to the mitigating circumstances which those cases held could not be excluded as a matter of law from any consideration.

It would appear, especially given this lack of requirement for instructional guidance or for any particular weight to be given allegedly mitigating circumstances, that the broader the range of such mitigating circumstances and the more attenuated their relationship to valid penological considerations, the more hindered is the system in the performance of its function of rationally distinguishing between those defendants for whom death is appropriate and those for whom it is not. Similarly, in such circumstances the discretion of the sentencing authority becomes more unlimited and unreviewable. It is difficult to understand how a system which requires that the sentencer be given unlimited discretion to assign whatever weight it desires to whatever it might consider to be mitigating can be fairly described as tending "to ensure that the death penalty will be imposed in a consistent, rational manner," *id.* at 3430 (concurring opinion of Stevens, J.), or to minimize "sentencing decision *patterns*

... [that are] arbitrary and capricious." *Godfrey*, 100 S.Ct. at 1765 (quoting *Gregg;* emphasis added).

The foregoing suggests that the more closely and objectively related an alleged mitigating circumstance is to a valid penological consideration, the stronger the argument for requiring that the sentencer be allowed to take that circumstance into account. The kind of factor which Penry asserts that the jury was not afforded an appropriate vehicle to give effect to is arguably quite remote from the recognized purposes of punishment and justifications for the death sentence. While the retributive justification for the death penalty depends to some extent on the degree of the defendant's culpability, as well as on the nature and results of the offense, the Supreme Court's decisions indicate that culpability in this connection refers to the defendant's culpability as directly related to his participation in and state of mind respecting the particular offense in question. *See Enmund*, 102 S.Ct. at 3378; *Tison*, —— U.S. ——, 107 S.Ct. 1676, 1683, 1687, 95 L.Ed.2d 127. *See also Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637 (1983). Such a determination, as well as that respecting rehabilitation potential, can be made with relative objectivity based on the evidence in a particular case. When the sentencer must go beyond that, as Penry would have it do, and must determine not only the accused's rehabilitation potential and his culpability on the occasion in question but also whether, in essence, he was at fault for being at fault, the decision-making process becomes vastly more subjective and necessarily involves speculation about wholly immeasurable abstractions such as free will and personal responsibility, as to which there is little of either common understanding or common agreement. As such, capital sentencing would also inevitably become far more unpredictable and unreviewable. Would it then, perhaps a few years later, again be subject to challenge on that ground? *

---

* In *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), the Court held it was *not un*constitutional to grant the jury "absolute discretion" to impose or not to impose the death sentence on one committing murder in the first degree. *Id.* at 1456. Interestingly, in

It is also questionable whether unlimited consideration of assertedly mitigating factors can be appropriately defended as a one-way street leading away from capital punishment. Such an argument is not responsive to the asserted desirability of minimizing arbitrariness and indiscriminacy. Moreover, it is doubtful that the street will really be one-way. The Court has held that a state may prove the nonexistence of potential mitigating circumstances, see *Barclay*, 103 S.Ct. 3418 at 3428, and where the range of potentially mitigating factors is almost unlimited what one sentencer may regard as mitigating another may view as aggravating.

Finally, even if, as now appears to be the case, the principles of the *Furman* plurality do not *require* a state to put any limits on the factors which the sentencer may determine to be mitigating, nevertheless this does not mean that a state has no voice in choosing the "substantive factors relevant to the penalty determination." *Ramos*, 103 S.Ct. at 3453. *See also id.* at 3452. While it is plain that whatever discretion a state may have in this respect does not extend to excluding from all consideration the defendant's potential for rehabilitation, his lack of dangerousness, or the nature of his participation in or state of mind respecting the crime charged, never-theless, it may be that a state has room to place *some* other limits on the sentencer's discretion, at least if those limits subserve valid penological purposes. Surely *Furman* teaches us that a valid penological purpose is fostering predictability, consistency, objectivity, rationality, and reviewability in capital sentencing. That purpose would seem to be fostered by not affording the jurors a vehicle by which to give decisive effect to the sort of considerations advanced by Penry, insofar *only* as the jurors may deem those considerations wholly irrelevant to either of the two Texas capital sentencing special issues.

Accordingly, while there is indeed a tension between *Jurek* and expressions in other recent decisions of the Court, it is by no means clear that *Jurek* has been or should be fatally undermined.

---

the companion case of *Crampton v. Ohio*, the Court noted, but suggested no error in, the instruction to the jury that it "'must not be influenced by any consideration of sympathy.'" *Id.* at 1461. By the next year, during which Justices Harlan and Black departed the Court, *McGautha's* "absolute discretion" holding was substantially rendered a dead letter by *Furman*, as was confirmed four years later in *Gregg*, 96 S.Ct. at 2936 n. 47. This may reflect the rapidity, or perhaps the ambiguity, of "the evolving" of "standards of decency" referenced in Chief Justice Warren's opinion in *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958), which had likewise proclaimed the constitutionality of capital punishment. *Id.* at 597–98. Now, a few years still later, has *McGautha* returned, though in the altered form of a *mandatory* requirement? To some extent, the answer, in light of the Court's post-*Gregg* opinions, must be "yes," but just to what extent is not fully clear.

Answering the latter question is particularly difficult in light of the fact that the Eighth Amendment's proscription of "cruel and un-usual punishments" appears, from its text, context, and history, to be *substantive*, at least apart from whatever procedural connotations "unusual" may have. The latter may be consistent with the procedural approach of *Gregg* and of Justices Douglas, Stewart, and White in *Furman*. But the then unprecedented *procedural* reading of the Eighth Amendment given by *Lockett* thrusts entirely in the opposite direction. That the Court has since embraced such a *Lockett*-type procedural requirement as a component of its current Eighth Amendment jurisprudence cannot be doubted. Nor can it be doubted, however, that such a component is not only opposite from that of *Gregg* and the *Furman* three, but is also distinct from the traditional procedural due process approach exemplified, among the post-*Gregg* capital punishment cases, by decisions such as *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Thus, though we know that the *Lockett*-type procedural component exists, there are fewer of the normal guideposts by which to make a principled gauging of its limits and contours.