**James RUSSELL, Petitioner–Appellant,**

v.

**James A. LYNAUGH, Director, Texas Department of Corrections, Respondent–Appellee.**

No. 88–6010.

United States Court of Appeals, Fifth Circuit.

Dec. 8, 1989.

**1206**

David Cunningham, Houston, Tex., for petitioner-appellant.

Charles A. Palmer, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for respondent-appellee.

Before CLARK, Chief Judge, JOHNSON and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this death penalty case we will not dwell on the sordid facts proved in the petitioner's conviction for capital murder. Suffice it to say that James Russell murdered Thomas Stearns, a crucial witness against him in an unrelated robbery for which he was about to be tried, and that the murder was especially mean and vile, involving kidnapping and rape. As is usually true in most of these death penalty cases, Russell's innocence is not even remotely suggested. As is also true in most of these cases, the wheels of justice have

moved very, very slowly over more than a decade.

## I

Russell was indicted in cause number 9969 on May 13, 1974, for the felony offense of capital murder. This original indictment was dismissed, and Russell was reindicted in cause number 10,560 on February 17, 1977. Russell was tried by a jury in the 130th Judicial District Court, Fort Bend County, Texas, beginning on November 15, 1977. The jury returned a verdict of guilty on the offense charged and sentenced Russell to death. The Texas Court of Criminal Appeals affirmed on March 12, 1980. *Russell v. State*, 598 S.W.2d 238 (Tex.Crim.App. *reh'g den.* April 23, 1980). On November 17, 1980, the United States Supreme Court denied Russell's petition for writ of certiorari. *Russell v. Texas*, 449 U.S. 1003, 101 S.Ct. 544, 66 L.Ed.2d 300 (1980). Russell then was scheduled to be executed on December 7, 1981. On November 20, 1981, Russell filed an application for state writ of habeas corpus in the state court in which he was convicted; on December 2, 1981, the Texas Court of Criminal Appeals, denied relief. *Ex parte Russell*, No. 10,096.

On December 1, 1981, Russell filed an application for writ of habeas corpus and motion for stay of execution in federal court, *Russell v. Estelle*, No. H-81-3149. On December 2, 1981, that court entered an order staying Russell's execution and scheduled an evidentiary hearing for February 1, 1982. On May 10, 1982, the state filed its motion to dismiss. On June 22, 1982, the court entered an order allowing Russell to file an amended petition on or before July 8, 1982. Russell then moved for an extension of time, and on July 9, 1982, the court entered an order extending the time for filing the amended petition to July 20, 1982; it also rescheduled the evidentiary hearing for August 20, 1982; Russell filed his amended petition on July 20. He then moved for a continuance of the evidentiary hearing, moved to expand the record, and moved for the appointment of experts and investigators. On August 6,

1982, the court entered an order rescheduling the evidentiary hearing for October 5, 1982, but the hearing subsequently was cancelled. On January 28, 1983, Russell filed a supplemental petition. On April 17, 1984, the state filed a supplemental motion to dismiss, and motion for summary judgment; on May 25, 1984, the state filed a second supplemental motion to dismiss; and on February 8, 1985, the state filed a third supplemental motion to dismiss and motion for summary judgment. On April 10, 1986, the court entered a memorandum and final judgment, denying all relief and dismissing Russell's application. Russell then filed a motion to amend the judgment, and on October 26, 1987, a federal magistrate entered a memorandum and recommendation in which he recommended that the motion be denied. On September 21, 1988, the district court adopted the magistrate's recommendation, denied the motion to amend judgment, and rescinded its stay of execution. This appeal followed.

## II

### A

■ The first issue we address is whether the trial court erred in sustaining the state's challenge for cause to venire member Hoover. Russell argues that the state erred under *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), because Hoover's answers on voir dire indicated only that Hoover's opposition to the death penalty would have *affected* his deliberation and consideration of issues of fact, not that it would have "substantially impaired" it. Under *Witt*, a potential juror's opposition to the death penalty must "substantially impair" that person's ability to serve as juror to become disqualified as a juror.

■ The state makes a two-fold rebuttal to Russell's argument. First, the state contends that Russell waived his right to appeal Hoover's dismissal because he did not object at trial. Under Texas law a failure to object at trial to the exclusion of a juror constitutes a waiver of the right. *Johnson v. State*, 629 S.W.2d 731, 735–36

(Tex.Crim.App.1981); *Crawford v. State*, 617 S.W.2d 925, 932 (Tex.Crim.App.1980), *reh'g den.* (1981). An adequate and independent finding of procedural default bars consideration of a federal claim on either direct or habeas review if the last state court rendering a judgment in the case "clearly and expressly" states that its judgment rests on a state procedural bar. *Harris v. Reed*, — U.S. —, 109 S.Ct. 1038, 1042–43, 103 L.Ed.2d 308 (1989). The state argues that this condition was met here because on direct appeal the Texas Court of Criminal Appeals applied the contemporaneous objection rule and plainly stated that it was doing so. *Russell v. State*, 598 S.W.2d at 246–47. In the absence of a showing of cause for the procedural default and actual prejudice from the error, federal courts must defer to state default rules. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Since the Texas Court of Criminal Appeals plainly stated that it was applying its procedural default rule and no cause and prejudice was raised here, the state's argument concludes, the Texas court's finding of procedural default is an adequate and independent state ground that bars us from reviewing the merits of Russell's contention.

Second, the state argues that venireman Hoover was properly excluded based on the merits of the challenge. The state concedes that under *Witt* the standard to be applied is "substantially impair," but it argues that the trial judge should be upheld because he was in the best position to judge the depth of the venireman's feelings about capital punishment and to decide whether the state properly challenged that juror for cause. Without evidence that the judge actually applied the wrong standard, the reviewing court must presume that the trial court applied the correct standard. The sole fact that the prosecutor used the word "affect" rather than the talismanic words "substantially impair" does not mean that Hoover's response could not have betrayed to the trial judge an opposition to the death penalty strong and clear enough to require his disqualification.

■ Because we agree that the Texas appellate court's finding of procedural default bars us from reaching the merits, we need not determine whether the state's challenge to venireman Hoover was properly sustained. We come to this conclusion because we are fully convinced that the Texas Court of Criminal Appeals unambiguously applied a procedural bar to the petitioner's claim. We now turn to trace the procedural background that underlies this conclusion.

B

At trial several potential jurors, like Hoover, expressed opposition to the death penalty. The specific colloquy with respect to Hoover was:

[Q. Prosecutor] You are told that this Defendant is charged with the murder of a man by the name of Stearns. It is further alleged that he is charged with he committed the murder while kidnapping. Now, one charged with the offense, if convicted, is guilty of capital murder, for which the mandatory penalty is life or death. It only carries two penalties. Now, with the understanding let me ask you this: Do you have any religious or conscientious scruples against the infliction of death as a punishment for crime?

[A. Hoover] I don't have any religious, but I do have conscientious.

[Q.] All right, sir. Is this a long-held feeling? Have you felt this way for some time?

[A.] Yes. I have.

[Q.] Now, I think I told you briefly Tuesday—I am sorry. I am getting kind of rumdum.... that today that you don't have to decide specifically which penalty will apply. However, if you were sitting as a juror you would be asked certain fact questions and dependent upon how you answered those questions that would absolutely direct the Judge of which sentence he impresses. He doesn't have any discretion. If you answer them yes, he has to give him death. If you answer them no, he has to give him life. So let me go just a little bit further with you.

Knowing that that this is the two penalties, life and death—with that understanding, would that knowledge affect your deliberations on any issue of fact—your thinking in consideration of those fact questions?

[A.] Yes. Because the death penalty would enter into it.

[Prosecutor:] All right, sir. We would challenge for cause, your Honor.

THE COURT: All right, Thank you, Mr. Hoover. You may go and Mrs. Cole will mail your check.

105 S.Ct. at 848.

As is apparent, defense counsel made no objection to the dismissal of Hoover. Indeed, defense counsel made no objection to the dismissal of *any* of the *"Witherspoon"* jurors. Although defense counsel made an effort to rehabilitate some *Witherspoon* jurors, he made no effort to rehabilitate Hoover.

After the jury convicted the petitioner and sentenced him to death, he appealed to the Texas Court of Criminal Appeals. *Russell v. State*, 598 S.W.2d 238, and assigned as error, inter alia, the dismissal of three *Witherspoon* jurors. Hoover, however, was not among them. The court considered each of the *Witherspoon* jurors that were raised on appeal. Concerning James Ober, the court ruled as follows:

When the trial court sustained the State's challenge for cause to Ober, appellant voiced no objection. *The failure to object waives any error.* See *Burks v. State*, 583 S.W.2d 389 (Tex.Cr.App. 1979) (On Motion for Rehearing); *Hughes v. State*, 562 S.W.2d 857 (Tex.Cr. App.1978); *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr.App.1977); *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.1976). However, even if appellant had preserved error here, the record *clearly* reflects that Ober was disqualified under the doctrine of *Witherspoon.* This contention is overruled.

*Id.* at 246.

The next veniremember, considered by the court was Tommy Kostelnik, and the court said in full:

When the trial court excused Kostelnik, appellant voiced no objection thereto. See *Burks v. State*, supra; *Hughes v. State*, supra; *Shippy v. State*, supra. Thus, no error is preserved for review. Nevertheless, we note that as we have previously stated, *Witherspoon* does not require formal answers. See *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App. 1979); *White v. State*, 543 S.W.2d 104 (Tex.Cr.App.1976). Upon review of this "cold record," it appears to this Court that this venireman was disqualified under *Witherspoon.* Kostelnik never equivocated in his opposition to the imposition of the death penalty, and the import of his testimony is that he would always be unable to vote for the infliction of such a severe penalty. Appellant's contention is overruled.

*Id.* at 247.

Finally the court addressed prospective juror Peggy Ryan and concluded:

The record reflects that appellant did not object when this juror was excused nor did he even request to examine her. *As such, this failure to object waives any error.* See *Burks v. State*, supra; *Hughes v. State* supra; *Shippy v. State*, supra; *Boulware v. State*, supra. Even though error is not preserved for review, we note that the record supports the conclusion that this prospective juror was disqualified under the doctrine of *Witherspoon.*

*Id.* at 247.

After the Supreme Court denied certiorari, *Russell v. Texas*, 449 U.S. 1003, 101 S.Ct. 544, 66 L.Ed.2d 300 (1980), the petitioner returned to the state trial court and applied for habeas relief. For the first time, he raised the dismissal of venireman Hoover as a violation of his sixth amendment right to an impartial jury. The trial court denied the petition for writ of habeas corpus, citing the court of appeals' previous disposition of the case. Russell then appealed to the court of appeals which, in an unwritten order, denied the writ.

**C**

Against this background we must address the question whether the last state

court rendering judgment in the case "clearly and expressly" stated that its judgment rests on a state procedural bar." *Harris v. Reed*, 109 S.Ct. at 1043. We turn now to examine *Harris*.

In *Harris* the state court, in its opinion addressing the defendant's habeas claim, had "referred" to its procedural rule that "those cases which could have been presented [on direct appeal], but were not, are considered waived." *Id.* at 1040. The state court had then proceeded to consider the merits of the petitioner's ineffective-assistance claim, which had not been raised on direct appeal. The issue before the Supreme Court was whether the "plain statement rule" of *Michigan v. Long*, 463 U.S. 1032, 1042, 103 S.Ct. 3469, 3477, 77 L.Ed.2d 1201 (1983), would be applied to habeas cases, that is, whether a state court must make a plain statement that it was relying on the procedural bar as a basis for the disposition of the claim in order to bar the federal court from considering the merits of the claim. In concluding that the "plain statement rule" applied, the court held:

> [A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case " 'clearly and expressly' " states that its judgment rests on a state procedural bar.

*Harris v. Reed*, 109 S.Ct. at 1043

Although *Harris* makes plain that the state court must unambiguously rely upon the procedural default as a basis for its disposition of the case, it also makes clear that a state court may, at the same time it relies on state procedural rules, address the federal substantive issue at stake without compromising the state procedural bar; in short, "a state may reach the merits of a federal claim in an alternative holding." *Id.* at 1044, n. 10. As Justice O'Connor said in *Long*, "If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision." 103 S.Ct. at 3476.

D

We now turn to the question whether the disposition of this case by the state court satisfies the "plain statement" rule.

First, it is absolutely clear that the Texas Court of Criminal Appeals applied the state procedural bar in rejecting all of the petitioner's *Witherspoon* claims that were raised on direct appeal. The petitioner would argue, however, that when Hoover's dismissal was finally contested in the habeas case, the Texas Court of Appeals simply denied relief in an unwritten order; thus, the petitioner argues "the last court rendering judgment" on the claim did not clearly and expressly apply the state procedural bar. We think that this overly technical argument fails to detract from the unambiguous expression of the Texas Court of Criminal Appeals. On each occasion that the dismissal of a *Witherspoon* juror was raised, the procedural bar was, in fact, applied on the grounds precisely present in the Hoover claim: no objection to the dismissal of the venireperson had been raised at trial. The petitioner can provide no reason for distinguishing Hoover's case as any different from that of any other *Witherspoon* venireman. Furthermore, at the time this case was before the Texas Court of Criminal Appeals, there was no serious substantive issue presented by the Hoover claim under existing federal law, since neither *Witt* nor *Adams* had then been decided by the United States Supreme Court; consequently no grounds can be advanced, such as miscarriage of justice, upon which the state might have excepted the Hoover case from the uniform ruling on all *Witherspoon* claims.

Nor is the simple denial of the petitioner's rerun of identical claims on habeas any basis to ignore the clear and express rulings of the Texas appellate court. Indeed, we unhesitatingly read this disposition of the habeas claims as a clear and express reliance upon the earlier, fully articulated rulings applying the procedural bar to all *Witherspoon* claims. Moreover, when we apply the literal words of *Harris*, we can only conclude that, true to the command of

these words, "the last state court rendering a judgment in the case," that is the Texas Court of Criminal Appeals, "clearly and expressly stated that judgment rests upon a state procedural bar," *Harris*, 109 S.Ct. at 1043, when it ruled on the *Witherspoon* issue. The "plain statement" rule does not require that the state court regurgitate the words of its earlier clear and express rulings every time identical issues are resubmitted to that court in the same case. All that is required is that "the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case," *Caldwell v. Mississippi*, 472 U.S. 320, 327, 105 S.Ct. 2633, 2638, 86 L.Ed.2d 231 (1985), and here actual reliance was expressed on three occasions in the state court's last opinion on the subject. Consequently it could not be plainer to us.

Moreover, for us to do other than to recognize the ruling of the Texas Court of Criminal Appeals would be to contravene the important purpose for which *Wainwright v. Sykes* exists. Respect for the independence of state courts has been one of the primary cornerstones for the refusal of federal courts to decide cases where there is an adequate and independent state ground. *Michigan v. Long*, 103 S.Ct. at 3476. We do not know how the Texas Court of Criminal Appeals could have been clearer in asserting an independent state ground as a basis for rejecting the *Witherspoon* claims in this case. To ignore this emphatically stated basis for the state court's rulings, stated on three occasions in its opinion, would certainly exhibit disrespect for the judgment of the state court, and its right, as an independent judiciary, to apply its own constitutionally proper laws in deciding its own cases.

Finally, in demonstrating our respect for the state court and its judgment in this case by recognizing its procedural bar ruling, we act consistent with the reasons asserted for adopting the "plain statement" rule in *Michigan v. Long* and in *Harris v. Reed*. Here, for example, we need not examine or interpret state law in order to determine whether the court rejected the petitioner's claim on an adequate and independent basis under state law; we certainly avoid any further delay in this case that might be required to send it back to the state court for any further clarification; consequently, the unambiguous ruling of the state appellate court relieves us of placing any further burden on the state court to demonstrate the absence of our jurisdiction; and finally, the unambiguous ruling of the state court assures that we are not required to dismiss this case because we are uncertain how the state court ruled. *See Michigan v. Long* 103 S.Ct. at 3475–76.

Additionally, the unambiguous rulings of the appellate court in this case avoid the imposition of any burden on the federal courts that were noted in *Harris v. Reed*, 109 S.Ct. at 1044. For instance, in order to determine whether a state procedural bar precludes our consideration of the merits in this case, we are not required to examine the state court record to determine whether a procedural fault was argued to the state court; nor are we required to undertake any extensive analysis of state law to determine whether a procedural bar was potentially applicable to the case since the state court plainly and unambiguously applied it. In this case, the plain statement of the Texas appellate court "achieves the important objective of permitting the federal court rapidly to identify whether federal issues are properly presented before it." *Id.*

Thus, because the Texas appellate court unambiguously applied an independent and adequate state law when it rejected the petitioner's *Witherspoon* claims, including veniremember Hoover, we are barred from further review of the merits of the petitioner's *Witherspoon* claim.

### III

■ The second issue on appeal is whether the admission in the guilt-innocence phase of Russell's trial of evidence of an extraneous offense and conviction, which was later reversed on appeal, undermined the fundamental fairness of the sentencing phase. Russell argues that the use of an extraneous offense, i.e., the robbery

of the Radio Shack store at which Thomas Stearns worked, violated the rule of *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). In that case, the Supreme Court held that the eighth and fourteenth amendments of the Constitution preclude the death penalty when it is based in part on an extraneous offense that was vacated subsequent to the capital trial. Russell contends that *Johnson* is directly applicable here because as a result of the prosecution's repeated references to the robbery conviction, the jury could not have avoided basing its verdict on that conviction, even though that conviction was later overturned, *Russell v. State*, 604 S.W.2d 914 (Tex.Crim.App.1980). Furthermore, he asserts, since this is a death case, any doubts about whether the extraneous-offense evidence should have been admitted must be resolved in Russell's favor. *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 1867, 100 L.Ed.2d 384 (1988).

The state contends that *Johnson* does not control this case because here the jury was instructed not to consider the conviction; the prosecution offered the extraneous-offense evidence only to show that the robbery charges were pending at the time of the murder and that therefore Russell had a motive to kill Stearns; in asking for the death penalty, the prosecution emphasized other factors, such as the gruesome nature of the crime and Russell's lack of remorse, that in themselves would have justified the death penalty; and the Texas capital sentencing scheme is structured differently from that of Mississippi.

We agree that the instant case is clearly distinguishable from *Johnson*. In *Johnson*, the Supreme Court considered a Mississippi death sentence for capital murder based in part upon a prior New York conviction, later overturned, of second degree assault with intent to commit first degree rape. At the sentencing hearing the prosecutor repeatedly referred to the document that had officially committed the defendant to prison in New York. Moreover, an authenticated copy of that document was the sole evidence supporting one of the aggravating circumstances justifying the death penalty. In holding Johnson's death sentence unconstitutional after the New York conviction was overturned, the Court stressed that the prosecutor had introduced no evidence concerning the alleged assault itself but only documentary evidence of the conviction, and that the Mississippi Supreme Court had drawn no distinction between Johnson's conviction for assault and the conduct underlying that conviction. *Johnson*, 108 S.Ct. at 1986.

Here, by contrast, the trial court thoroughly instructed the jury that the robbery conviction was not evidence at trial on the murder charge, and that he was admitting it only for the purpose of showing motive. In addition, the robbery conviction was never used to satisfy independently any contested issue in the case. Finally, our reading of the record indicates that the state's references to the robbery, taken as a whole, did not emphasize Russell's conviction. Rather, the prosecutor emphasized his propensity for violent conduct, and hence the courage of Stearns who had agreed to testify against him. Thus, we hold that admission of the extraneous-offense evidence was not violative of Russell's constitutional rights.

### IV

The third issue we consider is whether the district court erred in finding that Russell received effective assistance of counsel. Russell argues that his representation was constitutionally deficient both at trial and on appeal. He asserts that his lawyer failed to investigate the law and the facts. In particular, he failed to discover alibi witnesses who could have testified in the guilt-innocence phase of the trial and character witnesses who could have testified in the punishment phase. He further contends that his lawyer was intoxicated at trial, had an actual conflict of interest during the representation, and on appeal wrote a brief so sloppy as to prejudice him. Finally, Russell argues that the federal district court should have afforded Russell an evidentiary hearing under *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and *Streetman v. Lynaugh*, 812 F.2d 950 (5th Cir.) (applying *Townsend* to a

claim of ineffective assistance of counsel), *reh'g den.*, 818 F.2d 865 (1987), and, on remand, *Streetman v. Lynaugh*, 674 F.Supp. 229 (E.D.Tex.1987), *stay den.*, 835 F.2d 1519 (5th Cir.1988). Russell contends that the facts surrounding the lawyer's representation are relevant and material to his habeas petition, are in dispute, have not been adequately developed in state court, and if proved would entitle him to relief.

The state responds that Russell has no entitlement to an evidentiary hearing under *Townsend* and *Streetman* since there are no undisputed facts that, if proved, would entitle Russell to relief.

To determine whether Russell's allegations, if proved, would establish the right to habeas relief, *Streetman*, 812 F.2d at 956, refers to *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the sixth amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversarial process that renders the result unreliable.

104 S.Ct. at 2064. A lawyer's performance is deficient only if it falls below an objective standard of reasonableness as informed by prevailing professional standards. *Id.* at 2065. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*

 Russell argues that his lawyer failed to investigate adequately before trial, and in particular failed to identify alibi witnesses for the guilt-innocence phase and character witnesses for the punishment phase. Russell claims that minimal investigation would have revealed childhood friends and Russell's minister as helpful character witnesses. Given the weakness of such testimony when juxtaposed with the overwhelming evidence of guilt, the horrifying nature of the crime, and the abundant impeachment material available to the state, his lawyer acted reasonably in not putting these witnesses on the stand. Furthermore, Russell specifically identifies no potential alibi witnesses who did not testify. Thus, Russell has failed to show that the lawyer's performance in this respect was deficient and prejudicial. With regard to Russell's other ineffective-assistance-at-trial argument, that the lawyer's performance was diminished by alcohol, Russell does not show that his alcohol use, if true, deprived Russell of a fair trial.

 As for the argument that his lawyer was ineffective on appeal, Russell quotes from the brief submitted to the Texas Court of Criminal Appeals and makes the general comment that the brief is unworthy of any lawyer in a death case. Russell, however, ascribes no specific prejudice to the submission of this brief and thus fails to establish a basis for relief. Finally, with respect to Russell's conflict-of-interest allegation, the Supreme Court in *Strickland* held that where a conflict of interest exists the court will presume that the prejudice prong of the test is satisfied. *Id.* 104 S.Ct. at 2067. However, "prejudice is presumed only if the defendant demonstrates the attorney 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348–50, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980)). Russell argues that a conflict of interest arose when the state called Fred Hewitt as a prosecution witness, since Russell's attorney had represented Hewitt on previous occasions in criminal matters. This relationship, it is argued, prevented

the lawyer from vigorously cross-examining Hewitt. Here, although it is unquestioned that the lawyer and Hewitt had a continuing lawyer-client relationship, there is no evidence that the lawyer was representing Hewitt on any active matter; nor is there any evidence that he questioned Hewitt any less aggressively as a result of the alleged representation than he otherwise would have done. In fact, Hewitt told the judge in a bench conference that he specifically waived his attorney-client privilege so that the lawyer could question him thoroughly, and that his relationship with the lawyer did "not have anything to do with this case." Thus, given these facts, we perceive no conflict of interest between the relationship with Hewitt and an effective cross-examination of him in behalf of Russell.

In sum, because Russell has not alleged any facts relating to his representation that, if proved, would entitle him to habeas relief, he has no right to an evidentiary hearing.

## V

■ The fourth issue for consideration is presented by Russell's brief statement that we should consider the constitutionality of the Texas death penalty scheme in light of the Supreme Court's decision in the then-pending case of *Penry v. Lynaugh*, 832 F.2d 915 (5th Cir.1987), *cert. granted*, — U.S. ——, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988). Since Russell's brief was filed in this case, the Supreme Court has issued its opinion in *Penry*. *Penry v. Lynaugh*, — U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The Supreme Court held that the Texas death penalty statute was unconstitutional as applied in *Penry* because the statutory jury instructions provided no vehicle for the jury to express its reasoned moral response and give mitigating effect to Penry's evidence of mental retardation and childhood abuse. No such conclusion is warranted here.

Under the Texas capital sentencing procedure, a jury is required to answer three special issues:

(1) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Tex.Code Crim.Proc.Ann. art. 37.071 (Vernon 1981 & Supp.1989).

The only evidence offered at trial that was even arguably mitigating was presented to the jury in the context of the second special issue. The argument of Russell's counsel at the penalty phase best emphasized this position thus:

> But I do want to talk to you about the second issue.
>
> . . . . .
>
> This young man has lived for 26, 27, 28 years in and around Ford Bend County, I assume. Counsel for the State of Texas here says he has.
>
> The first 18, 19 years—whatever it was—20 years, he had no trouble. If he had have they would have had it here in the record.
>
> What has suddenly changed him to make you believe that he would in the future continue acts of violence that would constitute a continuing threat to society?
>
> Well, if you give just ten noes to this No. 2 Issue his sentence is life an automatic life term in the penitentiary.

This crime-free period in Russell's background was specifically proffered in the context of the second special issue. The jury was clearly offered the opportunity to give mitigating effect to that evidence by answering "No" to the question on future dangerousness. The second special issue thus provided a sufficient vehicle for the jury to express its reasoned moral response and give mitigating effect to the evidence

concerning Russell's background. *Penry,* 109 S.Ct. at 2974–48; *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 2329–30, 101 L.Ed.2d 155 (1988) (plurality opinion); 108 S.Ct. at 2333 (opinion concurring in judgment).

In connection with his ineffective counsel argument Russell proffered to the district court affidavits from his friends and relatives who asserted they could testify as to Russell's reputation and would express their opinion that Russell was not a continuing threat to society, was capable of remorse, and had the ability to reform himself. Such potential evidence would have relevance to the question of future dangerousness. The second special issue similarly would have provided the jury with an adequate vehicle to give mitigating effect to that evidence. *Penry,* 109 S.Ct. at 2948. Such evidence, however, was not presented at trial.

Furthermore, Russell has made no showing that his trial counsel felt constrained by the Texas statute not to investigate potential mitigating facts or to present such evidence at trial. *See King v. Lynaugh,* 868 F.2d 1400, 1405 (5th Cir.), *cert. denied* — U.S. ——, 109 S.Ct. 1576, 103 L.Ed.2d 942 (1989). The Texas death penalty statute therefore did not unconstitutionally limit the jury's consideration of any potentially mitigating evidence in this case.

## VI

The fifth issue on appeal is whether the state of Texas denied Russell his constitutional right to a speedy trial. Under *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), we apply a four-part balancing test to determine whether the defendant received a speedy trial within the meaning of the Constitution. The factors include length of delay between arrest and punishment, the reasons for the delay, assertion of the right, and prejudice to petitioner. *Id.,* 92 S.Ct. at 2192–93.

With regard to the first factor, Russell contends that forty-one months elapsed from the original indictment to trial, and that under *Barker* such a long delay is presumptively prejudicial. The state does not contest the length of the delay, but disagrees that it was prejudicial. Without agreeing that such a long period is presumptively prejudicial, we think that such a lengthy delay, unless mitigated by other factors, certainly raises real and troubling speedy trial concerns.

This concern brings us to the second factor, the reason for the delay. Russell argues that the long delay before trial was caused by his attorney's repeated requests for continuances despite Russell's complaints and prodding to go to trial; therefore, he contends, he was a victim of the delay, not a cause of it. However, the fact that Russell's counsel received continuances indicates that the trial judge believed continuances were necessary in the interest of Russell's defense. Thus, we do not give great weight to Russell's privately voiced complaints to counsel. *See Gray v. King,* 724 F.2d, 1199 (5th Cir.), *cert. denied,* 469 U.S. 980, 105 S.Ct. 381, 83 L.Ed.2d 316 (1984). Furthermore, the record reflects that the real cause for the delay lay elsewhere. Russell's only assertion to the trial court of his speedy trial right came in a motion to dismiss made on November 5, 1975, some eighteen months after the first indictment for murder on May 13, 1974. The trial court denied the motion without explaining itself, but the records show that Russell's robbery trial and related proceedings stretched from March 1974 until August 1975. The intervening robbery trial is the probable cause of delay, not any misconduct on the part of the state or Russell's lawyer.

Third, with respect to his assertion of his right to a speedy trial, Russell maintains that he amply asserted his right on the one occasion that he filed a motion, which was under the original indictment more than two years before trial, on November 5, 1975. The motion was denied. That indictment, however, was ultimately dismissed. A second indictment for murder, strengthened by the assertion that the murder occurred in the course of the commission of the robbery, was returned on February 17,

1977, and Russell proceeded to trial without protest on November 15, 1977. Thus, Russell never asserted his speedy trial right again after November 5, 1975. That single, brief and abandoned effort falls short of the assertion required by *Barker*.

Finally, Russell argues that the delay prejudiced him in two ways: first, his original counsel withdrew and he had to change counsel; and second, the delay compounded his anxiety because, while serving time for the robbery, he was also awaiting another criminal trial. Taking the second argument first, we cannot see how the fact that he was already serving time for robbery while awaiting the murder trial compounded his anxiety. It certainly seems to us that he would have been just as anxious about an impending murder trial if he had been free on bail. Indeed, the fact that he was already serving time actually lessens our speedy trial concerns because, since Russell was not incarcerated solely on the murder charge, the delay cannot be said to have caused an unwarranted detention.

Russell's argument that the delay caused him to have to change counsel, thereby prejudicing him, is disingenuous since Russell's own accusations and complaints against his original counsel drove the latter to conclude that he could not work with Russell. Furthermore, we agree with the state that the performance of the substitute lawyer did not prejudice him for purposes of his speedy trial claim any more than it did for purposes of his ineffective assistance claim. Thus, in the absence of evidence that Russell was prejudiced by having to change counsel during the proceedings, or that his defense was impaired, we hold that Russell did not suffer any cognizable prejudice by change of counsel.

On balance, given the failure of Russell to show that he frequently and forcefully asserted his rights in a manner calculated to be effective, that the reason for the delay was illegitimate, and that he suffered concrete prejudice, we cannot say that the state infringed Russell's constitutional right to a speedy trial.

## VII

Because we conclude that none of Russell's contentions is meritorious, the judgment of the district court denying habeas relief is

AFFIRMED.

CLARK, Chief Judge, specially concurring:

I concur in the affirmance of the judgment of the district court denying habeas corpus relief and in all that Judge Jolly writes. As to Part II, I agree "that if Russell had raised the issue, the Texas court would have held that Russell similarly had waived his right to appeal the point." However, unlike Judge Jolly, I do not agree that we should rest our decision here solely on procedural by-pass. I would also affirm the excuse of the venireman, Hoover, on the merits.

Both Judge Jolly and Judge Johnson have set out the reporter's transcript of the pertinent questions and answers from Russell's jury voir dire. A person present at the time who was trying to understand the feelings expressed would not parse the questions and answers in this fashion. Rather, he would weigh what was said in its surroundings and full context for its ultimate meaning. To aid that understanding, I paraphrase the essence of what was said. In November 1977, the trial judge listening to this exchange heard potential juror Hoover say:

I have long held conscientious scruples against the infliction of the death penalty.

Because infliction of the death penalty would enter into my deliberations on issues of fact in this case, those scruples would affect my deliberations.

Hoover's statements go beyond saying he would accept his responsibilities with special seriousness. They are far more than a mere honest acknowledgement that he might be affected in his jury service.

Even if *Adams* and *Witt* required that this trial judge test Hoover's 1977 response by the subsequently developed talisman:

"prevent or substantially impair,"[1] the statements would have met that test. Present case law does not look to precise words alone. We assay the trial judge's appraisal of the potential juror's beliefs. None of us reading this one part of the transcript today was present to personally observe Hoover as he answered these questions 12 years ago. The trial judge was. He saw Hoover when he spoke. That observation was made in the context of all that had gone on in the prior exchanges between counsel and other prospective jurors.

In my view, a fair reading of this cold transcript alone reveals that the trial judge could have—indeed, should have—concluded that Hoover's abiding conscientious scruples against the death penalty would prevent the proper performance of his duties as a juror in accordance with his instructions and oath. If that trial judge had had the benefit of the new test phrase, he certainly would have articulated it when excusing Hoover. Given the added benefit of observing the whole voir dire process and Hoover's demeanor as he answered questions, the trial judge's unchallenged decision to excuse Hoover is entitled to the statutory presumption of correctness required by § 2254(d). On the merits, I can find no fault with Hoover's exclusion from this jury panel.

JOHNSON, Circuit Judge, dissenting:

This writer is compelled to take issue with the majority opinion in the instant case. By concluding that this Court is procedurally barred from reaching the merits of Russell's claim that venireman Hoover was unconstitutionally excused, the majority effectively ignores the Supreme Court's recent pronouncement in *Harris v. Reed*, —— U.S. ——, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). To my mind, the plain language and history behind *Harris* compel

a conclusion that this Court is not foreclosed from reaching the merits. Quite simply, the last state court rendering a judgment on Russell's petition, the Texas Court of Criminal Appeals, did so without a written order. Such denial cannot and does not constitute a clear and express statement that the state court based its denial on the procedural bar. Absent such a clear and express statement, this Court must proceed to the merits of the claim.

Upon examination of the substance of Russell's claim, I am convinced that venireman Hoover was in fact excluded in violation of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). I therefore must respectfully dissent.

*PROCEDURAL BAR*

Procedural default bars federal habeas review *only* if the last state court rendering judgment in the case clearly and expressly rests its judgment on the procedural default. *Harris* 109 S.Ct. at 1043. Because the last state court to render a decision on Russell's habeas petition, the Texas Court of Criminal Appeals, did so without a written order, there are not sufficient indicia that this denial was based on the failure of Russell's counsel to object to venireman Hoover's exclusion. The procedural bar simply does not operate to prevent review by this Court. The majority, however, concludes that "it is absolutely clear that the Texas Court of Criminal Appeals applied the state procedural bar in rejecting all of petitioner's *Witherspoon* claims." Consequently, the majority concluded that this Court is foreclosed from considering the merits of the claim.

This "clear" invocation of the procedural bar to which the majority refers, is, in my view, murky at best.[1] The Texas Court of

---

1. I would leave unanswered the substantial question as to whether *Adams* and *Witt* so clarified *Witherspoon* as to announce a "new rule" of constitutional procedure. See: *Teague v. Lane*, —— U.S. ——, 109 S.Ct. 1060, 1072–75, 103 L.Ed.2d 334 (1989); *Penry v. Lynaugh*, —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989);

*Sawyer v. Butler*, 881 F.2d 1273 (5th Cir. en banc 1989).

1. *Harris* and its predecessors instruct that the mere existence of a basis for a state procedural bar, such as the contemporaneous objection rule, is not talismanic. Instead, in order for review in federal court to be inappropriate, "the

Criminal Appeals, on direct appeal, indicated that the objection to the venireman's dismissal was not raised in compliance with Texas procedural rules. The court went on, however, and noted that "in the interest of justice, we shall review appellant's complaint." *Russell v. State*, 598 S.W.2d 238, 245 (Tex.Crim.App.1980). The court then proceeded to spend two and one-half pages discussing the merits of the federal claim. Consequently, the opinion does not clearly indicate that the procedural default rather than the merits of the federal claim constituted the ground for denial. At any rate, the basis of the denial on direct appeal is not significant in the context of the instant case. We are concerned with the language of the last state court rendering a judgment. That opinion, handed down by the Texas Court of Criminal Appeals on the habeas petition, does not contain the clear and express statement of reliance on the procedural bar as required by Harris.

In *Harris*, the Supreme Court held that: a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case " 'clearly and expressly' " states that its judgment rests on a state procedural bar.

*Harris* 109 S.Ct. at 1043 (citations omitted). The last state court to enter a judgment on Russell's petition, the Court of Criminal Appeals, did so simply by entering a denial without a written order. This writer cannot agree that the action of the Court of Criminal Appeals in simply entering a denial without any kind of written order "clearly and 'expressly' " stated "that its judgment rests on a state procedural bar." Because of the absence of a written order, any determination that the state court relied on the procedural bar must necessarily be based on speculation. As the Court in *Harris* realized, to allow such second-guessing of the rationale behind a state court order would impose

> substantial burdens on the federal courts.... [In] some circumstances, ... the federal habeas court would be forced to examine the state court record to determine whether procedural default [was presented].... Much time would be lost in reviewing legal and factual issues that the state court ... is better suited to address expeditiously. The "plain statement" requirement achieves the important objective of permitting the federal court rapidly to identify whether the federal issues are properly presented before it.

*Harris* 109 S.Ct. at 1044. This language is particularly pertinent to the instant case, *Russell*, where the last court to enter a judgment did so without written order. There is no clear and express indication that the denial was based on the procedural bar; this Court should proceed to the merits of the claim.

The position of the State during oral argument of the instant case is interesting; the State there indicated that "if all we had was a denial without written order, that would not be sufficient to satisfy *Harris v. Reed*." The State then (and now) argued that this Court may presume the Court of Criminal Appeals' reliance on the procedural default by examining the recommendation of the district court on the habeas petition as well as the opinion of the Texas Court of Criminal Appeals on direct appeal. This suggestion, upon which the majority apparently bases its conclusion that the claim is procedurally barred, misinterprets the history and rationale behind *Harris*. *Harris* and *Long* constitute component

---

state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). However, it is not always an easy task to discern whether the state court actually relied on the procedural bar or whether relief was denied on the merits. The problem of ambiguous state court orders is not a new one. The Supreme Court addressed this issue in *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77

L.Ed.2d 1201 (1983). In *Long*, the Court adopted the "plain-statement" rule in order to eradicate the problems presented by ambiguous state court references to state law on direct appeal. Consequently, a federal court is presumed to *have jurisdiction* to review the merits of a federal claim *unless* the state court plainly states that the decision rests on an adequate and independent state ground. In *Harris*, the Court applied the *Long* "plain-statement" rule to habeas review as well.

parts of a body of jurisprudence designed both to lessen the burden placed on federal courts and to reduce the intrusiveness of federal review of claims originating in the state court system.

Moreover, the adoption of a presumption such as the one suggested by the State was specifically addressed and rejected by the Court in *Harris*. *Harris* 109 S.Ct. at 1043–44. The Supreme Court has indicated that in a situation where a decision by the last state court could potentially rest on either federal grounds or an amalgamation of state and federal law grounds, if

> the adequacy and independence of any possible state law ground is not clear from the face of the opinion, [then the] most reasonable explanation [is] that the state court decided the case the way it did because it believed that federal law required it to do so.

*Long* 103 S.Ct. at 3476. In order to avoid this presumption of a decision on the merits, the state court need only clearly and expressly indicate that the decision is based on state law grounds. I cannot agree that a denial without a written order constitutes such a clear and express statement.

Requiring a state court to explicitly state that it is relying on a procedural bar does not place an undue burden on state judicial decisionmaking. "As *Long* itself recognized, it would be more intrusive for a federal court to second-guess a state court's determination of state law." *Harris* 109 S.Ct. at 1044. This type of intrusive behavior is exactly what the State here advocates; the majority supports that position today. The majority's approach in this case, however, has in my view been categorically foreclosed by *Harris* and *Long*.

There is a need for uniformity in federal law. The Supreme Court has recognized that the previously employed haphazard approach to construing ambiguous state court orders fails to sufficiently promote uniformity.

> [T]his need goes unsatisfied when we fail to review an opinion that rests primarily on federal grounds and when the *independence* of an alleged state ground is

not apparent from the four corners of the opinion.

*Long* 103 S.Ct. at 3476 (emphasis in original). The need to which the Supreme Court refers is most palpable in cases such as this where a life hangs in the balance. In such a case, strict adherence must be paid to the rules governing the use of the procedural bar doctrine. Absent a clear and express statement by the last state court rendering a judgment that the petition was denied because of adequate and independent state grounds, this Court is bound by Supreme Court precedent to review the merits of the claim. To misapply this principle is to do a serious injustice to both the petitioner and capital punishment jurisprudence.

For the foregoing reasons, I cannot agree that this Court is procedurally barred from reaching the merits of Russell's first ground for habeas relief.

### THE MERITS

Russell argues that venireman Hoover was excused in violation of *Adams v. Texas*. In *Adams*, the Supreme Court held that the Texas statute allowing a juror to be excused for cause "unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact," had been unconstitutionally applied. Tex. Penal Code § 12.31(b). The *Adams* Court concluded that, as applied, the Texas statute permitted the excusal of too broad a class of individuals because it "exclude[d] jurors whose only fault was to take their responsibilities with special seriousness or to acknowledge honestly that they might or might not be affected." *Adams* 100 S.Ct. at 2529. The Court went on to note that there was no indication in the record that the individuals were so irrevocably stationed in opposition to the death penalty so as to frustrate the State's legitimate interest in seeing the death penalty scheme administered. The Constitution prohibits the exclusion of jurors whose irrevocable opposition is not apparent. "The Constitution disentitles the State to execute a sentence of death imposed by a jury from

**1220**

which such prospective jurors have been excluded." *Id.*

Of course, *Adams* in no way indicates that a juror's bias must be stated in an emphatic, straightforward manner before exclusion is proper. Rather, the Court indicated that a juror may not be challenged for cause unless his views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* 100 S.Ct. at 2526.

In the instant case, Russell was tried in 1977, three years before the decision in *Adams*, and two years before certiorari was granted in *Adams*. At the voir dire stage, the State made frequent use of the following question, or a similar version thereof:

> Knowing that that is the two penalties, life and death—with that understanding, would that knowledge affect your deliberations on any issue of fact—your thinking in consideration of those fact questions? [2]

Hoover voir dire, Record Vol. 4 at 808. Venireman Hoover was excused immediately after answering the above question affirmatively.[3] Russell now argues that this exclusion violates *Adams v. Texas.*

The State and the concurring opinion have pointed to the presumption of correctness which this Court must afford a trial court's determination that a prospective juror cannot perform his statutory function

2. This question summarizes the content of Tex. Penal Code § 12.31(b):

Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror.shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact.

3. Hoover's voir dire is as follows:

Q: Your name is Richard E. Hoover?
A: Yes.
Q: Mr. Hoover, I am Jack Salyer. I am the District Attorney over in Matagorda and Wharton Counties.
I, along with your good District Attorney, Bill Meitzen, will represent the State in this case that we are attempting to get a jury to try.
This is what is known as voir dire examination. It's the opportunity that both sides have to visit with you and find out how you feel about some of our laws.
Let me assure you that there is no right or wrong answers. We are not going to argue with you or try to get you to change your mind about anything. We simply want to know how you feel about some of our laws. Okay?
A: Yes, sir.
Q: Try to relax and I will try to be very speedily with you.
A: Okay.
Q: You are told that this Defendant is charged with the murder of a man by the name of Stearns.
It is further alleged that he is charged with he committed the murder while kidnaping [sic].
Now, one charged with the offense, if convicted, is guilty of capital murder, for which

the mandatory penalty is life or death. It only carries two penalties.
Now, with this understanding let me ask you this:
Do you have any religious or conscientious scruples against the infliction of death as a punishment for crime?
A: I don't have any religious, but I do have conscientious.
Q: All right, sir. Is this a long-held feeling? Have you felt this way for some time?
A: Yes, I have.
Q: Now, I think I told you briefly Tuesday—I am sorry. I am getting kind of rum-dum
.... that today that you don't have to decide specifically which penalty will apply. However, if you were sitting as a juror you would be asked certain fact questions and dependent upon how you answered those questions that would absolutely direct the Judge of which sentence he impresses. He doesn't have any discretion.
If you answer them yes, he has to give him death.
If you answer them no, he has to give him life.
So let me go just a little bit further with you.
Knowing that that this is the two penalties, life and death—with that understanding, would that knowledge affect your deliberations on any issue of fact—your thinking in consideration of those fact questions?
A: Yes. Because the death penalty would enter into it.
MR. SALYER: All right, sir. We would challenge for cause, Your Honor.
THE COURT: All right. Thank you, Mr. Hoover. You may go and Mrs. Cole will mail your check.

faithfully and impartially and must therefore be excused. *See* 28 U.S.C. § 2254(d); *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Wicker v. McCotter*, 783 F.2d 487 (5th Cir.), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986).

Notwithstanding the customary deference due the trial court's determination, I cannot agree that in the instant case this Court must defer to the trial court's determination that venireman Hoover was properly excused for cause because of his beliefs regarding the death penalty. While section 2254(d) does indicate that this Court should defer to a trial court's determination, it cannot be forgotten that the trial judge made the determination of juror bias prior to the decision in *Adams* at a time when both section 12.31(b) and *Witherspoon v. Illinois* constituted adequate grounds for excusal of a veniremember. *See Moore v. State*, 542 S.W.2d 664 (Tex. Crim.App.1976), *cert. denied*, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977).

In *Wainwright v. Witt*, the Supreme Court discussed the amount of deference that a federal court reviewing a habeas petition must pay to a trial court's determination of juror bias. Decided after *Adams*, the decision in *Witt* addressed the trial court's conclusion that a juror's views prevented or substantially impaired the performance of that juror's duties in accordance with the juror's oath. "The trial judge is of course applying some kind of legal standard to what he sees and hears,

but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Witt* 105 S.Ct. at 855. At the time of Russell's trial, the "prevent or substantially impair" legal standard of *Adams* and *Witt* had not yet been articulated as the exclusive grounds for excusal. The decision in *Adams*, indicating that the exclusion of a broader class of veniremember resulted in an unconstitutional jury panel, had not yet been handed down and section 12.31(b) stood as good law in Texas without any parameters on its application. Consequently, while it is true that this Court was able to personally observe Hoover's demeanor, it is equally true that we are unable to discern whether the trial judge applied the correct legal standard. Considering the existence of a statute subsequently determined to be unconstitutional, it is highly likely that the standard applied by the judge was in error.

I cannot discern how the reasoning behind *Witt* can apply in the instant case; the Supreme Court rested the *Witt* decision on the proposition that the "judge is of course applying some kind of legal standard." [4] In the instant case, the judge was potentially applying the wrong legal standard; the amount of deference due his determination of juror bias is therefore lessened considerably. [5]

The State further points to the following question, a version which was asked of most, but not all, of the veniremembers: [6]

4. *See also Witt* 105 S.Ct. at 858. The Court there refers to the proposition that the trial court is correctly applying the law: "the trial court [is] hopefully imbued with a fair amount of common sense as well as an understanding of the applicable law."

5. This conclusion does not conflict with § 2254(d). Pursuant to that section, a trial judge's findings of fact are presumed correct unless the factfinding procedure was not adequate or the material facts were not developed. Where, between the time of trial and the time of habeas review, the class of people who may be excluded has been narrowed due to the articulation of a different legal standard, I cannot agree that the material facts were necessarily developed. This is especially so in the case of venireman Hoover who was excused immediately after stating that he was in fact affected.

The State points to this Court's decision in *Brock v. McCotter*, 781 F.2d 1152 (5th Cir.), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986), to support its proposition that a pre-*Adams* excusal must be upheld. However, *Brock* differs considerably from the instant case; there, the voir dire of the veniremember in question was quite extended. Consequently, there was a sufficient factual basis on which a trial judge could base a conclusion of juror bias.

6. In addition to the arguments presented in the text, the State has argued that the failure of Russell's counsel to attempt to rehabilitate Hoover is detrimental to his claim today. This argument is unpersuasive in light of the jurisprudential universe in which the judge and the attorneys were operating at the time of the trial. As the Texas Court of Criminal Appeals noted in *Moore v. Texas*, 542 S.W.2d 664 (Tex.Crim.App.

In other words, you could answer the questions with the rest of the jury honestly without regard to the effect those answers might have on the sentence in this case? [7]

The State argues that, through the use of this question, it equated section 12.31(b) with an inquiry into whether the prospective jurors could answer the punishment issues honestly based on the evidence presented and the court's instructions.

Consequently, the State contends that the use of its follow-up question indicates that section 12.31(b) was applied in a manner consistent with the "prevent or substantially impair" rule of law. At oral argument, the State pointed out that of the fifty-three veniremembers, forty-seven were asked whether they would be "affected." Forty answered "no" and were subsequently asked the previously set-out follow-up question. What the State fails to point out, however, is that of the jurors who said that they *would* be affected, none were asked the follow-up question. The State, for example, did not proceed to ask "so, you are saying that you would be unable to answer the questions with the rest of the jury honestly without regard to the effect those answers might have on the sentence in this case?

Consequently, it is fair to say that while the jurors who indicated that they would not be affected were asked to clarify their degree of self-removal, no such judicial yardstick was placed against the jurors who, like Hoover, said they would be affected. Pursuant to my interpretation of the Supreme Court cases in this area, this failure to explore how much the veniremember would be affected is fatal to the State's argument.

The essential question is whether a potential juror will conscientiously apply the law to the facts. That a juror will be affected is not enough. Most potential jurors would in some way be affected by the prospect of participating in condemning an-

other to die. "Every right-thinking man would regard it as a painful duty to pronounce a verdict of death upon his fellow-man." *Witherspoon* 88 S.Ct. at 1773 n. 8 (citation omitted). In order to determine if a juror will be prevented or substantially impaired in his ability to uphold his oath to apply the law, the questioning must indicate that by "affect" the veniremember intends to indicate more than that he "would be more emotionally involved or would view [the] task 'with greater seriousness and gravity.'" *Wainwright* 105 S.Ct. at 850.

> [To] exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law.

Consequently, while section 12.31(b) still exists in the Texas statutory scheme, in order to be constitutionally applied, there must be some indication that the judge has been able to gauge how much the juror would be affected. No such indication is present in the record. I am convinced that Hoover's exclusion constitutes an *Adams* violation.

*CONCLUSION*

For the foregoing reasons, I am convinced that Russell was unconstitutionally sentenced to death in violation of *Adams v. Texas* and *Wainwright v. Witt.* As the Supreme Court has indicated, if even one veniremember is unconstitutionally excused in this manner, the sentence must be reversed to the extent that it sustains the imposition of the death penalty. I therefore must respectfully dissent.

---

1976), both 12.31(b) and the Supreme Court's pronouncement in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), existed as separate viable grounds upon which to base a challenge for cause.

7. Venireman Hoover was not asked the follow-up question.